IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 30, 2008

**STATE OF TENNESSEE v. JAMES TERRY**

**Direct Appeal from the Circuit Court for Cocke County**
**No. 9440     Ben W. Hooper, II, Judge**

_____

**No. E2007-01573-CCA-R3-CD - Filed March 16, 2009**

_____

The defendant, James Terry, was convicted by a Cocke County Circuit Court jury of one count of rape, a Class B felony, and was sentenced as a Range I, standard offender to twelve years in the Department of Correction. On appeal, he contends that the evidence is not sufficient to support his conviction and that his sentence is excessive. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ., joined.

Thomas V. Testerman, Newport, Tennessee, for the appellant, James Terry.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Al Schmutzer, Jr., District Attorney General; and Amanda H. Inman and Joe C. Crumley, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case arises from charges the defendant raped his wife's great-niece over the course of a three-year time period from March 2001 to April 2004. As a result, the defendant was indicted in July 2004 on thirty-eight counts of rape and thirty-eight counts of incest and convicted of one count of rape.

A jury trial was conducted on the matter in September 2006. At trial, Dr. Hobart Ford testified that he had a general dentistry practice in Newport, Tennessee, and knew the defendant "as a friend and as an employee." Dr. Ford explained that the defendant had worked for him for "approximately seven to ten years," taking care of the maintenance of the building. Dr. Ford stated that the defendant was a "very good" worker and "[d]oes more than what he says."

Detective George Grooms, a thirty-seven-year veteran of the Newport Police Department, testified that his involvement in the case began on April 28, 2004, when the victim came with three other young ladies to his office "with a complaint that she had been having sexual intercourse with [the defendant] over a period of some three years." Detective Grooms said that he contacted Jason Dockery with the Department of Children's Services (DCS) in response to the victim's complaint, and the next day he and Dockery met the victim at the home of Nellie Martin on Ball Park Road in Cocke County, Tennessee. Detective Grooms stated that they had the victim contact the defendant by telephone and that they tape-recorded the conversation. Detective Grooms noted that the victim telephoned the defendant at Cocke County Baptist Hospital where he was a patient. The audio recording of the conversation between the victim and defendant was entered into evidence during Detective Grooms' testimony.

Detective Grooms testified that when the victim initially came to his office, she brought with her "a blue top and the panties that she said that she had worn . . . on April the 27th of 2004, that being the last day that she had sexual intercourse with [the defendant], and this occurred at . . . Ford's office as he was going through his janitorial process." Detective Grooms said he sent the items to the Tennessee Bureau of Investigation (TBI) Crime Laboratory for processing along with a mouth swab from the victim and a blood sample from the defendant. Detective Grooms stated that he "[did not] know . . . for a fact" whether the victim was subjected to a medical examination to determine if she had been forcibly raped.

DCS employee Jason Dockery testified that his involvement in the case began approximately on May 29, 2004, when he received a referral stating that the defendant allegedly sexually abused the victim, for whom he was a legal custodian. Dockery stated that he started working the case with Detective Grooms and that they decided to have the victim telephone the defendant to try to get the defendant to implicate himself on tape. Dockery said that the victim called the defendant and that Dockery was present for the entire conversation. He identified a transcript of the taped conversation and recalled that it was prepared by one of the DCS secretaries. Dockery stated that he reviewed the transcript, compared it with the audiotape, and determined that the transcript accurately reflected the contents of the tape.

Dockery testified that as part of his continued investigation he spoke with the defendant and his wife and that the defendant denied the allegations against him. Dockery said he spoke with the victim's two siblings, who resided with the defendant, and arranged for them to live with another relative. He recalled that when he first met the victim, she was staying with friends at the home of Nellie Martin and that he had her placed in the State's custody in order for her to stay in the Martin home. Dockery stated that he obtained a no-contact order through juvenile court to prevent the defendant from contacting the victim. Dockery recalled that the victim was sixteen years old when he first met her.

The victim testified that she was nineteen years old at the time of the trial and said she had lived in the home of Nellie Martin at 115 Ball Park Road in Cocke County, Tennessee, for almost three years. The victim stated that she had a sister, Desiree, who was currently in a foster home, and

a brother, Johnny, who was living with an uncle. The victim testified that the defendant was her great-uncle by marriage and that he had raised her.

The victim testified that the defendant first raped her in May 2001 at his home at 1545 Red Bud Drive in his bedroom. The victim recalled that the defendant started touching her body parts and took her clothes off and then "started doing it." She said that the defendant put his "private part" into her vagina and that the incident lasted about thirty minutes. She said he did not use a condom and ejaculated on her stomach. The victim testified that she did not tell anyone about what had happened because the defendant always told her that if she told, she would "get it," which she took to mean "he would try to kill me or whatever if I would have told."

The victim testified that the defendant continued to have sex with her three or four times a week every month and that the incidents took place at "Dr. Ford's, his house, in Jefferson City, anywhere he could do it." The victim stated that the encounters did not stop until April 2004 when she reported what had been happening. She said that the defendant had raped her the previous day at Dr. Ford's office and then took her to Nellie Martin's house. The victim remembered that the defendant did not use a condom and ejaculated on her stomach, which she wiped off with paper towels. She said she telephoned the defendant the next day from Martin's house and told him that she could not go to school. She recalled that the defendant told her to "meet him at the stop sign or [she] would get it when [she] got in the car." The victim stated it was then that she went to the courthouse and told Detective George Grooms.

The victim testified that Martin's daughter, Melissa Lundy; Martin's niece, Beth Reece; and Lois Lundy accompanied her to the police department. She said that Martin did not go with them because the defendant pulled into Martin's driveway looking for her. The victim stated that she told Detective Grooms that the defendant had raped her and that she went back to Martin's house. She recalled that Detective Grooms collected her shirt and panties. The victim stated that the day after she reported the defendant, Detective Grooms had her call the defendant and that a recording was made of the conversation. The recording was played for the victim, and she identified her and the defendant's voices on the tape. The recording was then played for the jury after which the victim testified that during the conversation the defendant promised he would quit having sex with her if she would return home.

The victim testified that she never asked the defendant to stop having sex with her, but she said he would withhold things from her if she did not want to have sex with him. She said that the items the defendant withheld were "[t]ampons and my laptop and clothes." The victim stated that "if I wanted tampons and stuff -- he would . . . sit there and watch me write the letters. And if I needed tampons or anything, I would have to have sex before I could get them." The victim said she did not want to have sex with the defendant, but she did not tell him no because she was scared of him. She said he always threatened her. She explained that the defendant told her "he would get [her] back" if she told on him. The victim testified that she had a boyfriend, Swan Price, for "about a month" when she was about fourteen.

On cross-examination, the victim admitted that she never reported the defendant's behavior to any teacher, guidance counselor, principal, police officer, her sister, or any other family member before telling Detective Grooms. The victim testified that she spent the night with Beth Reece the night before she reported the defendant and that she and Reece did not go to school the next day. The victim agreed that she was afraid the defendant and his wife would be upset that she had not attended school and that they sounded angry when they told her to meet them at the stop sign. She also acknowledged that she did not go to the stop sign, but instead admitted to Melissa Lundy and Beth Reece that the defendant had been raping her. With regard to the letters mentioned in direct examination, the victim stated that the defendant would stand over her and make her write letters to him asking for a laptop, tampons, and other things. The victim testified that she was friends with Tina Campbell, but she denied telling Campbell that she had lied about her father raping her.

Melissa Lundy, the twenty-six-year-old daughter of Nellie Martin, testified that she first met the victim when the victim spent the week with her cousin, Beth Reece, at her mother's house. Lundy said that Reece was living with Martin at that time. Lundy recalled that she was only at Martin's house one day that week and that was the day she met the victim. Lundy stated that the victim received a telephone call that night from the defendant and was crying and was very upset when she got off the telephone. Lundy recalled that she asked the victim why she was upset and that the victim said "that her dad had told her to meet him outside, for none of us to be outside when he came to pick her up." Lundy further recalled that the victim told her she was afraid to go home and said "that her dad had been making her have sex with him." Lundy stated that the victim was referring to the defendant when she said "dad." Lundy testified that they went to the sheriff's department after the victim's revelation.

TBI Agent Lawrence James, accepted as an expert in forensic biology and DNA analysis, testified that he analyzed the victim's underwear and blue shirt and that he detected the presence of spermatozoa in the underwear. Agent James stated that he analyzed a blood sample from the defendant and a saliva sample from the victim and that he determined the sperm found in the victim's underwear matched the defendant's DNA. On cross-examination, Agent James admitted that he did not know when the sperm sample was deposited on the underwear, nor did he personally know to whom the underwear belonged–only that it appeared to belong to a female.

At this point, the trial court granted a defense motion to dismiss the thirty-eight counts of incest as well as the March and April 2001 rape charges–counts one and two of the indictment. The court denied a defense motion to dismiss the remaining rape counts, and the defendant proceeded with his proof.

Desiree South, the eighteen-year-old sister of the victim, testified that sometime before the victim moved out of the defendant's house, the victim told her "she didn't like it there anymore because she wasn't getting her way and she just didn't want to be there." South stated that the victim was dating a boy, Swan Price, around the time she moved out of the defendant's house. She recalled, "[The victim] and my dad disagreed because Swan wasn't the best of type of person . . . . And she got mad because she didn't like the fact that he was trying to control who she dated." South

explained that she was referring to the defendant when she said "dad" because "he's my dad in my heart."

South testified that she and the victim shared a bedroom at the defendant's house and that the victim never mentioned anything about being sexually abused. South recalled there were problems in the home with the victim telling lies about her and her brother. She stated the defendant and his wife were strict about the children attending school.

Tina Campbell testified that she attended high school with the victim and said she overheard the victim say that her stepdad did not like her boyfriend and had told her that she could not see or call him. Campbell stated she then heard the victim say she was going to say that her stepdad raped her in order to get out of his house because she was not getting her way. Campbell recalled that she heard these statements in 2004, and she said she also saw the victim kissing Swan Price in the hall at school in 2004. Campbell stated that sometime later, she heard the victim say she had gone to the police and that when Campbell asked her if he raped her, the victim never would answer. On cross-examination, Campbell admitted that she did not contact the police concerning the victim's statements.

The defendant testified that he had never had sex with the victim. Asked what was going on in his home in the days before the accusation was made, the defendant responded that "[the victim] wanted to go see this boy, Swan Price. I figured she was too young to start running to see boys. I didn't like it and she knew it, so she got mad." The defendant recalled that approximately a week after their argument, the victim went to stay with Beth Reece on Ball Park Road. The defendant stated that he discovered the victim and Reece had skipped school, which was something he would punish her strongly for doing. The defendant said that he called the victim and told her where to meet for him to pick her up but that she did not show up.

The defendant testified that he did not remember receiving a phone call from the victim while he was in the hospital. He said he was in the hospital due to chest pains and was on pain medication while there. He stated he did not learn of the victim's accusations until after he was discharged from the hospital. The defendant claimed that the underwear containing his sperm were actually his wife's because his wife was the only person with whom he had sex. He said that at the time of the victim's accusations, the victim and his wife wore the same size underwear–something he knew because he was in charge of the laundry. The defendant acknowledged that he was not with his wife when she purchased that particular pair of underwear.

Following the conclusion of the proof, the jury returned verdicts of not guilty to rape or any lesser-included offenses in counts three through thirty-seven and a verdict of guilty to rape in count thirty-eight.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant first argues that the evidence is not sufficient to support his conviction. Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence; rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

In the present case, the defendant was convicted of rape, which is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act; (2) The sexual penetration is accomplished without the consent of the victim . . .; (3) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or (4) The sexual penetration is accomplished by fraud." T.C.A. § 39-13-503(a) (2003). "'Coercion' means threat of kidnapping, extortion, force or violence to be performed immediately or in the future or the use of parental, custodial, or official authority over a child less than fifteen (15) years of age[.]" Id. § 39-13-501(1) (2003).

The defendant asserts that "[n]o evidence of force for the offense for which [he] was convicted was shown. No lack of consent was claimed. No mental incapacity was suggested. Nothing was shown to suggest fraud. This would leave only the argument that '[c]oercion' had taken place." The State argues that the defendant coerced the victim's cooperation, thereby conceding that none of the other statutory circumstances were present. As to coercion, the defendant points out that the count of rape of which he was convicted occurred during the month of April 2004 when the victim was sixteen years old; therefore, coercion by means of "parental, custodial, or official authority over a child less than fifteen (15) years of age" was not met. We agree with the defendant on this point and on his claim that there was no evidence of a threat of kidnapping or extortion. However, we note that coercion can also be shown by threat of force or violence to be performed immediately or in the future. Id.

The State argues that the defendant coerced the victim's cooperation "by threatening to either harm her or kill her or by withholding things that she needed, if she told anyone what he had done to her." The defendant argues that there was no evidence of a threat of force introduced at trial with respect to the particular charge of which he was convicted.

As evidence of coercion, asked if she told anyone after the first sexual encounter, the victim said she did not because "[h]e always told me if I told I would get it," which she took to mean "he would try to kill [her] or whatever if [she] would have told." The victim admitted that she never

asked the defendant to stop having sex with her, but she indicated it was because the defendant would withhold "[t]ampons[,] . . . laptop and clothes" from her "if [she] didn't want to have sex with him[.]" The victim stated that she did not want to have sex with the defendant but did not tell him "no" because "[she] was scared of him" because "[h]e always threatened [her]" by saying "if [she] ever [told] that he would get [her] back." Even though the victim did not testify as to any specific threats by the defendant surrounding the April 2004 incident, the record supports the conclusion that the victim acquiesced to the sexual encounter with the defendant because of the past threats of harm.

In reaching this conclusion, we harmonize our result with the holdings of two cases previously decided by this court, State v. Steven Craig Fults, No. M2004-02092-CCA-R3-CD, Rutherford County (Tenn. Crim. App. July 7, 2006), perm. to appeal denied (Tenn. Nov. 13, 2006), and State v. Donald Wade Goff, No. E2002-00691-CCA-R3-CD, Campbell County (Tenn. Crim. App. Aug. 5, 2003). In Steven Craig Fults, the defendant repeatedly threatened to expose the minor victim as being homosexual if the victim revealed the defendant's crimes. There was evidence the victim acquiesced in the defendant's continuing abuse because of his fear of these threats. In Donald Wade Goff, there was neither a verbal threat nor a physical threat of violence. In concluding that the implicit evidence of coercion was insufficient, this court noted that the victim testified that she was afraid the defendant would hurt her because the defendant "was always telling everybody if you didn't do what he wanted . . . he'd do something to you, start a fight or something[,]" or "he'll be mad at [her]." The State presented proof that the defendant became intoxicated at times, but not that he was a violent person or became violent when drinking. Thus, there was no verbal threat related to the sexual activity or a general violent nature from which the victim might reasonably fear retribution. We believe the present case is more akin to Fults than to Goff because in this case, there was evidence that the defendant "always" made threats to "get [the victim] back" or that she would "get it" if she revealed his misdeeds. The victim interpreted the defendant's threats to mean that he "would try to kill me or whatever," and these threats along with the fear of not receiving basic provisions, such as clothing and tampons, were the basis of the victim's submitting to the crimes. Based upon this, we conclude that the evidence was sufficient for a reasonable jury to convict the defendant of rape.

## II. SENTENCING

At the sentencing hearing the victim testified that the defendant's actions had scarred her for life. The victim claimed that the defendant needed to "pay the price." Asked on cross-examination what the defendant did to force her to engage in sexual intercourse on the last occasion, she responded, "He let me go to my friend's house." The court then sustained an objection to the defendant's questioning. The defendant's presentence report and psychosexual evaluation were entered as exhibits at the hearing.

In sentencing the defendant, the trial court first noted that there were no mitigating factors. The court found that the testimony at trial showed that the defendant had a previous history of criminal behavior despite the jury's thirty-five not guilty verdicts, but did not give the factor "a great

deal of weight." See T.C.A. § 40-35-114(2) (2003).[1] The court noted the enhancement factor of "doing something to gratify your desire for pleasure or excitement" but said, "I'm not really totally satisfied that the record in this case, even though it's just a preponderance of the evidence measure of proof, that I would want to give a whole lot of weight to that." See id. § 40-35-114(8). The court stated that it was "terribly concerned" that the defendant abused a position of private trust, given that the defendant raised the victim, she considered him her father, and she had confidence and faith in him. See id. § 40-35-114(16).

The court also discussed the impact of the defendant's actions on the victim and the confidence of the public and society in the resolution of this type of case. The court mentioned that deterrence was not part of its decision because "[t]here seems to be a pretty good school of thought that there's not much of anything that controls this type of behavior." The court concluded, "[T]aking all those things and trying to lump them together so as to not depreciate the seriousness of this matter . . . the Court sentences you to 12 years to the Tennessee Department of Correction[] on Count 38[.]"

The defendant argues that the trial court imposed an excessive sentence. He asserts that the trial court failed to consider the overall principles of sentencing, his potential for rehabilitation, and non-statutory mitigating factors such as his lack of a criminal record and good social history.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the
> final sentencing decision, identify the mitigating and enhancement
> factors found, state the specific facts supporting each enhancement
> factor found, and articulate how the mitigating and enhancement

---

[1] We note that although the defendant was sentenced after the change in the sentencing laws took effect, there is no indication in the record that he signed a waiver of his ex post facto protections for sentencing under the new laws. See T.C.A. § 40-35-210, Compiler's Notes. Therefore, the sentencing law in effect at the time of the offenses was the proper framework for establishing the defendant's sentences.

-8-

> factors have been evaluated and balanced in determining the sentence.
> T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210 (2003); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

Under the applicable statute, the sentence to be imposed by the trial court for a Class B, C, D, or E felony is presumptively the minimum in the range if neither enhancement nor mitigating factors are present. T.C.A. § 40-35-210(c) (2003). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Id. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Id. § 40-35-210, Sentencing Comm'n Cmts.; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

Our review will be de novo upon the record because it is not clear that the trial court considered all the principles of sentencing or relevant facts and circumstances in reaching its decision. We first note that the trial court properly considered as an enhancement factor the defendant's history of criminal behavior based on testimony concerning the thirty-five charges of which he was found not guilty. See State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000) (holding that trial court may enhance sentence by applying enhancement factors based on facts found by preponderance of the evidence, notwithstanding defendant's acquittal of charge based upon those facts); State v. Carico, 968 S.W.2d 280, 287-88 (Tenn. 1998) (holding that evidence of a defendant's sexual acts other than the act of which he was convicted could properly be considered as criminal behavior by a trial court for enhancement purposes). Although the trial court did not give this factor "a great deal of weight," we view it to be significant.

Second, we do not believe the court should have applied the enhancement factor (8) that the offense was committed to gratify the defendant's desire for pleasure or excitement, given that the only real proof of his motive was that he ejaculated during intercourse, which by itself is not enough to prove motive. See State v. Arnett, 49 S.W.3d 250, 262 (Tenn. 2001) (holding that "proper application of factor ([8]) requires the State to provide additional objective evidence of the defendant's motivation to seek pleasure or excitement through sexual assault").

Third, the record supports the trial court's enhancement of the defendant's sentence based on his abuse of a position of private trust under enhancement factor (16). See State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999) (noting that "[w]here the adult perpetrator and minor victim are

members of the same household, the adult occupies a position of 'presumptive private trust' with respect to the minor"); <u>Carico</u>, 968 S.W.2d at 286 (stating that "[t]here can be no question that the rape of a child residing in the family is an abuse of private trust"). We give this factor considerable weight.

The trial court did not find any mitigating factors. However, the presentence report indicates that the defendant has no prior criminal record. The defendant's lack of a criminal record can qualify as a mitigating sentencing factor. However, we give it little weight in view of the proof at the trial. Furthermore, we are not persuaded that the defendant's potential for rehabilitation is good. While his age and relatively good social history may reflect positively on his potential for rehabilitation, the record reflects that the defendant was rated poorly for honesty in the evaluation. In addition, notwithstanding the defendant's denial of the offense in the psycho-sexual evaluation, there was evidence of a taped telephone call between the victim and the defendant in which the defendant made inculpatory statements. Given the number of times the defendant committed an offense against the victim, as shown by a preponderance of the evidence, the defendant's potential for rehabilitation is poor.

Upon review and mindful of the principles of sentencing, we conclude that a proper balancing of the enhancement and mitigating factors supports the twelve-year sentence imposed by the trial court.

## CONCLUSION

Based on the foregoing and the record as a whole, we conclude that the evidence is sufficient to support the defendant's conviction of rape and that the defendant's sentence is not excessive. The judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE